IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 86167-1-I |
| Respondent, | DIVISION ONE |
| v. | |
| GLENARD TREVELL POOLE, a/k/a GLENARD T. POOLE, | UNPUBLISHED OPINION |
| Appellant. | |

SMITH, C.J. — In October 2019, Glenard Poole and his girlfriend, Alyssa Chastain, were involved in a high-speed chase with multiple law enforcement vehicles. Poole was later convicted of attempting to elude a pursuing police vehicle with a firearm enhancement. On appeal, Poole contends that the trial court violated his Sixth Amendment right to an impartial jury drawn from a fair cross section of the community when it denied his motion for a new jury panel. He also contends that there was insufficient evidence to support his conviction of attempting to elude a pursuing police vehicle. Because Poole fails to show a Sixth Amendment violation and because sufficient evidence exists to support his conviction, we affirm.

FACTS

Background

In the early morning hours of October 4, 2019, a Washington State Patrol (WSP) trooper observed Alyssa Chastain and Glenard Poole speeding in a

maroon-colored Nissan on a highway in east Pierce County. Chastain was driving. The trooper activated the lights and siren of his unmarked patrol car to attempt a traffic stop, but the Nissan continued to accelerate. The trooper alerted dispatch officers and followed the vehicle. The Nissan continued to flee and drive recklessly, straddling lanes, running a red light, and turning off all its lights. WSP eventually advised the trooper to terminate his pursuit.

WSP alerted other police agencies of the pursuit over dispatch. Several Pierce County Sheriff's deputies began pursuing the Nissan. Each of the Pierce County Sheriff deputies were in marked police vehicles with their lights and sirens on.

As the pursuit continued, Chastain leaned out of the window and fired a gun repeatedly at the officers. One of the shots shattered the back window of the car. Two others hit the officers' patrol vehicles. One of the deputies was able to perform a precision immobilization technique (PIT) maneuver, stopping the vehicle.

Once the Nissan came to a stop, police vehicles surrounded it. Officers commanded Chastain and Poole to exit the vehicle. Chastain and Poole remained in the vehicle, bent down, and appeared to reach toward the floor of the car. At that point, several officers opened fire. Chastain got out of the car and started running away. Poole then complied with officers and exited the vehicle and was arrested. On the floor of the passenger side of the car, officers recovered a black semi-automatic handgun. Another handgun was later recovered from the car. Forensic analysis revealed DNA from both Chastain and

Poole on both guns.

After Poole was arrested, he was transported to the Tacoma Police Department headquarters and interviewed by police. Poole told the officers that he was aware that he and Chastain were being pursued by the police and that he saw the lights and sirens behind them. At one point, Poole told officers that he had instructed Chastain to stop driving. But his story changed during the interview and he later denied telling Chastain to pull over or stop driving. Poole also indicated that he told Chastain to "try to lose" the police and to "try to get to her mom's." He explained to the officers that he told Chastain to "just do her thing" and that he loved her. Poole initially insisted that he was not aware there were firearms in the car, but he later admitted he knew about the guns. Poole also told officers that while Chastain shot at the pursuing police vehicles, he grabbed the wheel to steady the car.

Poole was charged with assault in the first degree and with attempting to elude a pursuing police vehicle. In both charges, Poole was named as a principal or, in the alternative, as an accomplice. Both charges included firearm enhancements.

<u>Jury Selection</u>

During voir dire, the State asked if any of the jurors thought that their experience as a witness or victim to a crime would affect their ability to be fair and impartial. Juror 4 replied that she wished to answer the question in private. Outside the presence of the other jurors, juror 4 disclosed that during a traffic stop, a police officer had "roughed [] up" her former husband, who is Black. The

3

juror explained that she felt at the time that she and her husband were the victims of racial profiling. Juror 4 also disclosed that she had been raped in the 1980s and that she felt the police did not do a good job investigating her case. Despite these experiences, juror 4 expressed that she could still fairly and impartially consider the evidence and apply the law given by the trial court.

But the next day, juror 4 changed her mind. Juror 4 stated: "I personally don't think that I could be unbiassed with this case." She then elaborated: "I have—with everything that's going on right now with—for me, I'm African American, and the police departments—I don't think that I would be a good juror." Then, when asked by the State if she was willing to give the State a fair trial, juror 4 answered, "No." When asked by defense counsel if she would be able to follow the court's instructions, juror 4 answered, "No."

The State moved to excuse juror 4 for cause. Poole did not object to the State's challenge but instead asked the court to disqualify the entire jury panel and start with a new panel. He argued that juror 4 was the only Black juror on the panel and that without her, Poole would "not have a jury with even one peer on it." Poole acknowledged that he did not challenge the venire when it was first empaneled and he also acknowledged that he was not challenging the process by which the jury was assembled.

The court dismissed the juror and denied Poole's request for a new jury venire. The court explained that "jury pools are created on a random basis" and that "[t]here has been nothing presented in the record to indicate that in any way or any populations being intentionally or systematically excluded from the jury

4

pool or jury selection process." The court noted that "[b]ecause of the random selection process, there is no guarantee of jury composition of a new jury group if [the parties] were to call one from jury administration." The court then denied Poole's motion for a new jury panel.

Later, at the beginning of trial, seated juror 1 asked a court employee why there were no Black jurors on the panel when the defendant is Black. Poole opted not to address the issue with the jury. The court agreed that this was the best course of action and the issue was not discussed further.

Verdict and Sentencing

The jury convicted Poole of attempting to elude a pursuing police vehicle and found that he or an accomplice was armed with a firearm during the commission of the crime. The jury acquitted Poole of the charge of assault in the first degree.

The court sentenced Poole to 30 days for the attempt to elude conviction and 18 months for the firearm enhancement for a total of 19 months of confinement.

Poole appeals.

ANALYSIS

Sixth Amendment Right to Fair Cross Section of the Community

Poole contends that the test for determining whether a defendant's Sixth Amendment right to a jury drawn from a fair cross section of the community is insufficient and urges this court to craft a new test that requires some representation of traditionally underrepresented groups in the venire. We are

unpersuaded. Poole provides no Gunwall[1] analysis demonstrating that our state constitution commands a more stringent test than the federal constitution in this context. Moreover, Poole's suggested approach appears to violate the randomness requirement of venire selection. Our State Supreme Court recently declined a similar request in State v. Rivers, 1 Wn.3d 834, 533 P.3d 410 (2023), concluding that the test set forth in Duren[2] still applies to such claims. Rivers is determinative here.

We review constitutional issues de novo and a trial court's rulings on challenges to the venire process for abuse of discretion. State v. Jorgenson, 179 Wn.2d 145, 150, 312 P.3d 960 (2013) (constitutional issues); State v. Clark, 167 Wn. App. 667, 674, 274 P.3d 1058 (2012) (venire process).

The Sixth Amendment guarantees criminal defendants the right to trial by an impartial jury. U.S. CONST. amend. VI. This right includes the right to jury panels drawn from a fair cross section of the community. Rivers, 1 Wn.3d at 851; Duren, 439 U.S. at 358-59. Representation of jurors does not need to be perfectly proportional to the population and defendants are "not entitled to exact cross-representation in the jury pool." State v. Hilliard, 89 Wn.2d 430, 440-42, 573 P.2d 22 (1977).

To prove a fair cross section violation under the Sixth Amendment under

---

[1] To determine whether our state constitution provides broader rights than the federal constitution in a particular context, we examine the constitutional guaranties in light of the six criteria outlined in State v. Gunwall, 106 Wn.2d 54, 720 P.2d 808 (1986).

[2] Duren v. Missouri, 439 U.S. 357, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979).

the test set forth in Duren, a defendant must show (1) a distinctive group (2) that is unreasonably underrepresented in the defendant's venire and in venires generally (3) as a result of systematic exclusion in the jury process. 439 U.S. at 364. "Systematic" means "inherent in the particular jury-selection process utilized." Duren, 439 U.S. at 366. All three factors must be met to establish a constitutional violation and the defendant bears the burden of proving that their jury selection system is unconstitutional. Duren, 439 U.S. at 364; Rivers, 1 Wn.3d at 863. Washington courts have consistently applied the Duren test to claims of underrepresentation on juries. See, e.g., In re Pers. Restraint of Yates, 177 Wn.2d 1, 18-23, 296 P.3d 872 (2013); State v. Cienfuegos, 144 Wn.2d 222, 230-32, 25 P.3d 1011 (2001); State v. Rupe, 108 Wn.2d 734, 746-48, 743 P.2d 210 (1987).

As an initial matter, we note that Poole only requested a new jury panel after the State challenged juror 4, suggesting that Poole first deemed the venire underrepresented once that juror was excused. But the fair cross section requirement "applies to the selection of the venire, not to the dismissal of individual jurors at the jury panel stage." State v. Meza, 22 Wn. App. 2d 514, 533, 512 P.3d 608, review denied 200 Wn.2d 1021 (2022). Nevertheless, we turn to the merits of Poole's claim.

Poole easily meets the first Duren element. Black people are a distinctive group for Duren purposes. Yates, 177 Wn.2d at 20.

In support of the second element, underrepresentation, Poole cites a 2022

Interim report for the Administrative Office of the Court[3] which concluded that Washington State juries are not demographically representative of their county of jurisdiction. But Poole makes no attempt at distinguishing underrepresentation in his venire from underrepresentation of Black jurors in venires generally. Moreover, "underrepresentation" in the sense that a group's representation is not at least equal to its proportion of the community, is not sufficient to show that the representation is not "fair and reasonable." Duren, 439 U.S. at 364. Without additional information or argument, Poole fails to meet this element.

Finally, Poole does not address the third Duren factor, whether the method of selecting venires systematically excludes a distinctive group.

Because Poole fails to meet the second and third Duren factors, his claim necessarily fails. Despite this, we acknowledge the challenges defendants like Poole face in making a fair cross section claim; historically, jury pools have not been representative of the larger community and the burden of proving such a claim is high.

Sufficiency of Evidence

Poole contends that there was insufficient evidence for the jury to find him guilty of attempting to elude a pursuing police vehicle. We disagree.

"Evidence is sufficient to support a guilty verdict if any rational trier of fact, viewing the evidence in the light most favorable to the State, could find the

---

[3] PETER COLLINS, BROOKE GIALOPSOS & BAILEY TANAKA, STATEWIDE JUROR SUMMONS DEMOGRAPHIC SURVEY PROJECT: AN ANALYSIS OF SELECTED COUNTY DATA, 2022 INTERIM REPORT (Dec. 2022) https://www.courts.wa.gov/subsite/mjc/docs/Washington%20State%20Jury%20Summons%20Demographic%20Study%20Interim%20Report%202022.pdf [https://perma.cc/W8LS-VQAZ].

elements of the charged crime beyond a reasonable doubt." State v. Cardenas-Flores, 189 Wn.2d 243, 265, 401 P.3d 19 (2017). When a defendant challenges the sufficiency of the evidence, they admit the truth of the all the State's evidence. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). On review, we view the evidence in the light most favorable to the State and draw reasonable inferences in the State's favor. Cardenas-Flores, 189 Wn.2d at 265-66. Direct and circumstantial evidence carry equal weight. State v. O'Neal, 159 Wn.2d 500, 506, 150 P.3d 1121 (2007). "This standard of review 'is highly deferential to the jury's decision, and we do not consider questions of credibility, persuasiveness, and conflicting testimony.' " In re Pers. Restraint of Arntsen, 2 Wn.3d 1022, 543 P.3d 821, 825 (2024) (internal quotation marks omitted) (quoting State v. Davis, 182 Wn.2d 222, 227, 340 P.3d 820 (2014)).

A person attempts to elude a pursuing police vehicle if they (1) willfully fail or refuse (2) to immediately bring their vehicle to a stop (3) and drive in a reckless manner (4) while attempting to elude a pursuing police vehicle after being given a visual or audible signal to stop. RCW 46.61.024(1).

An individual is guilty as an accomplice if he or she " 'solicits, commands, encourages, or requests' " another person to commit a crime. State v. Everybodytalksabout, 145 Wn.2d 456, 472-73, 39 P.3d 294 (2002) (quoting RCW 9A.08.020(3)(a)(i)).

Here, testimony from responding officers constituted sufficient evidence to support Poole's conviction. Pierce County Sheriff Deputy Holly Clark testified that when she turned her lights on to initiate a traffic stop, Chastain and Poole did

9

not slow down or stop. Deputy Clark also testified that the vehicle was "swerving in and out of traffic and continuing to drive at a high rate of speed" along a populated road. At one point, Deputy Clark witnessed Chastain and Poole drive into an oncoming lane of traffic, causing other vehicles to swerve out of the way to avoid crashing. Pierce County Sheriff Deputy Matthew Hirschi testified that when Poole and Chastain drove into lanes of oncoming traffic, they were going about a hundred miles per hour. Tacoma Police Sergeant Stuart Hoisington testified that Poole stated he knew police were following him and Chastain and that Poole saw the lights and sirens behind them. Sergeant Hoisington also explained that Poole informed him that he urged Chastain to continue driving and to try to lose the police. Tacoma Police Detective Philip Hoschouer testified that Poole told Chastain to "just do her thing" and try to outrun the police. Detective Hoschouer also testified that Poole stated Chastain's driving was "crazy." This testimony was sufficient for the jury to find all the essential elements of attempting to elude and for the jury to find that Poole acted as a principal or as an accomplice.

We affirm.

Smith, C.J.

WE CONCUR:

Coburn, J.               Bowman, J

10